333 F.2d 47
 Dwight ARMSTRONG, Denise Armstrong, James Armstrong, Jr., and Floyd Armstrong, Minors, by James Armstrong, Sr., their father and next friend, et al., Appellants,
v.
The BOARD OF EDUCATION OF the CITY OF BIRMINGHAM, JEFFERSON COUNTY, ALABAMA, et al., Appellees.
 No. 20595.
 United States Court of Appeals Fifth Circuit.
 June 18, 1964.
 Rehearing Denied July 21, 1964.
 
 W. L. Williams, Jr., Birmingham, Ala., Ernest D. Jackson, Sr., Jacksonville, Fla., Constance B. Motley, Norman Amaker and Jack Greenberg, New York City, Oscar W. Adams, Jr., Birmingham, Ala., for appellants.
 Joseph F. Johnston, Reid B. Barnes, Lange, Simpson, Robinson & Somerville, and Cabaniss, Johnston, Gardner & Clark, Birmingham, Ala., for appellee.
 Before MARIS,* GEWIN and BELL, Circuit Judges.
 GEWIN, Circuit Judge:
 
 
 1
 The controversy involved in this case relates to desegregation of the public schools of the City of Birmingham, Alabama. The background of the case is set forth in the opinion of this Court in Armstrong v. Board of Education of City of Birmingham, 5 Cir., 323 F.2d 333 (1963), and in the opinion of the District Court, 220 F.Supp. 217 (D.C.N.D.Ala.1963). When the opinion of this Court was rendered the case had been advanced on the docket and received consideration on an emergency basis. It is now before us on the merits.
 
 
 2
 After our opinion mentioned above, a plan was submitted[1] by the Birmingham School Board which provided essentially: (a) all applications for transfer or assignment on hand at the time the plan was proposed (August 19, 1963) would be processed; (b) all applications received on or before August 26, 1963, for assignment or transfer to the 12th grade were to be processed by the Board pursuant to its regulations under the Alabama Pupil Placement Law and approved or rejected by the term commencing in September, 1963, without discrimination as to race or color; and (c) subject to the foregoing provisions, all pupils in all schools of the Birmingham system were to remain assigned to schools to which they were assigned at the commencement of the school year in September of 1963.
 
 
 3
 Since our decision, the Supreme Court has rendered its per curiam opinion in Calhoun, et al., v. Latimer, et al., May 25, 1964, 84 S.Ct. 1235, dealing with the plan of the Atlanta School Board "authorizing free transfers with certain limitations in the city's high schools." As there stated, "Petitioners deny that this resolution meets the constitutional standards and assert that with respect to students in the elementary schools the plan will not achieve desegregation until sometime in the 1970's."[2] The Supreme Court reemphasized its decisions in Watson v. City of Memphis, 373 U.S. 526, 529, 83 S.Ct. 1314, 10 L.Ed.2d 529; Goss v. Board of Education, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632, and Griffin v. County School Board of Prince Edward County, ante, and concluded its opinion with the following statement from Goss:
 
 
 4
 "[W]e are not unmindful of the deep-rooted problems involved. Indeed, it was consideration for the multifarious local difficulties and `variety of obstacles' which might arise in this transition that led this Court eight years ago to frame its mandate in Brown in such language as `good faith compliance at the earliest practicable date' and `all deliberate speed.' Brown v. Board of Education, 349 U.S. [294] at 300, 301, 75 S.Ct. [753], at 756, [99 L.Ed. 1083]. Now, however, eight years after this decree was rendered and over nine years after the first Brown decision, the context in which we must interpret and apply this language to plans for desegregation has been significantly altered. Compare Watson v. City of Memphis, supra."
 
 
 5
 The Supreme Court has further spoken in Griffin v. County School Board of Prince Edward County, 84 S.Ct. 1226 (May 25, 1964), and concluded, "The time for mere `deliberate speed' has run out * * *."
 
 
 6
 At the evidentiary hearings the School Board presented extensive evidence relating to alleged differences and disparities between the ethnic group represented by the Negro children and that group represented by white children, claiming that such evidence formed a rational basis for separating such ethnic groups in the school room. The plaintiffs in the trial court (Negroes) did not offer evidence in opposition to such alleged disparities, but contend that under the Brown decisions[3] the Supreme Court has concluded that "Separate educational facilities are inherently unequal." The Board of Education further claims that the Brown decisions are limited to the facts there presented, that different facts are here presented and were not before the Court for consideration in the Brown decisions, and therefore a different result should be reached in the instant case in view of the evidence presented. As to this contention, the trial court concluded:
 
 
 7
 "Of course the starting point in any school segregation case must be Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the implementing decree of the court, Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and its reinterpretive opinion in Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). The basic premise of the court was expressed in simple, uncomplicated language: `Separate educational facilities are inherently unequal.' From it there flowed freely and naturally the enunciation of the constitutional principle: `Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.' 347 U.S. at page 495, 74 S.Ct. at page 692.
 
 
 8
 "Insofar as the opinions of experts in the fields of psychology and anthropology, in deposition, book and pamphlet form, may constitute an attack upon the major premise of the court, they are rejected out of hand. It would be supererogation to labor the obvious, that this court is bound by the opinions and judgments of the Supreme Court."
 
 
 9
 In view of the conclusion of the trial court and the repeated holdings by the Supreme Court, we are not persuaded that it is appropriate for this Court to recognize the disparities and differences claimed as a proper basis for the continuance of segregated schools. If such alleged disparities and differences constitute a proper basis for the maintenance of segregated schools, it is the function of the Supreme Court to make such a decision.
 
 
 10
 Plans providing for the integration of only one grade a year are now rare; and the possibility of judicial approval of such a grade-a-year plan has become increasingly remote due to the passage of time since the Brown decisions. In every case the burden rests squarely upon the school board to adopt and propose an appropriate plan, and to present evidence which will support and justify the plan proposed. Stell v. Savannah-Chatham County Board of Education (5th Cir. 1964), 333 F.2d 55. Upon consideration of all of the evidence and in the circumstances of this case it is our conclusion that this cause be remanded to the District Court with instructions to require the Birmingham School Board to present to the District Court forthwith for its consideration a plan of desegregation which will meet the minimum standards herein set forth. The 12th grade of the Birmingham School System was desegregated as ordered by the Court, using the Alabama Pupil Placement Law, during the year 1963. Commencing with the opening of school in September of 1964, this plan must be expanded to include the 10th and 11th grades in addition to the 12th grade. Commencing with the opening of school in September of 1965, the plan must be applied to the 9th grade and continue thereafter with one grade a year until the plan applies to the 8th and 7th grades, thus making it applicable to all high school grades.[4] The plan will be applied to one grade per year in the elementary schools, commencing with the 1st grade in September, 1964, and shall continue thereafter at the rate of one additional grade per year in the elementary schools until the plan is applied to all elementary school grades. The dual or bi-racial school attendance system, that is, any separate attendance areas, districts or zones, shall be abolished as to each grade to which the plan is applied and at the time of the application thereof to such grades, and thereafter to additional grades as the plan progresses. Bush v. Orleans Parish School Board, (5th Cir. 1962) 308 F.2d 491. The plan shall apply to the admission of new pupils coming into the school system for the first time. As stated in Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372, 384 (N.D.Ala.1958), and as noted in its opinion by the District Court in the instant case:
 
 
 11
 "`All that has been said in this present opinion must be limited to the constitutionality of the law upon its face. The School Placement Law furnishes the legal machinery for an orderly administration of the public schools in a constitutional manner by the admission of qualified pupils upon a basis of individual merit without regard to their race or color. We must presume that it will be so administered. If not, in some future proceeding it is possible that it may be declared unconstitutional in its application. The responsibility rests primarily upon the local school boards, but ultimately upon all of the people of the State.'
 
 
 12
 The Supreme Court, on direct appeal, granted the motion to affirm and affirmed the judgment upon the limited grounds, quoted directly above, on which this court rested its decision. Shuttlesworth v. Birmingham Bd. of Education, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145 (1958)."
 
 
 13
 We reiterate the importance of the constitutional administration of the Alabama Pupil Placement Law by the admission of students who are qualified on the basis of individual merit, without regard to race or color. The distinguished trial judge has so advised the Birmingham School Board in the following language: "This Court will not sanction discrimination by them [the Superintendent and School Board] in the name of the Placement Law." Indeed, the trial court concluded that if it should be demonstrated to the Court that the Alabama Pupil Placement Law was unconstitutionally applied, the original plaintiffs, or others similarly situated, were authorized to present to the Court supplemental complaints which would be given a preferred setting on the docket of the Court and heard on five days' notice to the defendants.
 
 
 14
 The administrative remedies afforded by the Alabama Pupil Placement Law need not be exhausted as a prerequisite to judicial relief, but such relief may be obtained in the United States District Court as provided in the opinion of that Court[5] and as hereinafter provided.
 
 
 15
 The proposed plan must be further implemented by giving timely notice of it by the Superintendent and Board of Education to the students, parents, teachers and other appropriate school personnel. Such notice, calculated to inform all concerned of their rights under the plan, may be given in any manner deemed appropriate by the District Court in the exercise of its discretion. Augustus v. Board of Public Instruction, 306 F.2d 862 (5th Cir. 1962). We also leave to the discretion of the trial court the fixing of dates and the period of time during which such applications are to be made and acted upon. Applicants will not be required to submit to undue delay in the consideration of their applications, or to burdensome or discriminatory administrative procedures. McNeese v. Board of Education, 373 U.S. 668, 83 S. Ct. 1433, 10 L.Ed.2d 622.
 
 
 16
 The United States District Court has wisely retained jurisdiction of this case for the purpose of permitting the filing of supplemental complaints in case of any unconstitutional application of the Alabama Pupil Placement Law against the plaintiffs, or others similarly situated, or with respect to any other unconstitutional action on the part of defendants (Superintendent, Board of Education, etc.) against them. Such complaints may be submitted as a class action as authorized by F.R.Civ.P. 23, thus avoiding the necessity of time consuming delays on the part of those who complain, and also avoiding repeated and extended hearings in the District Court.
 
 
 17
 The principles herein outlined are considered by the Court to be the minimum requirements. The District Court will exercise its discretion in directing the further implementation of the plan and in hearing any complaints which may be presented. As we have repeatedly stated, the sequence of responsibility is "first the school authorities, then the local district court, and lastly the appellate courts." Rippy v. Borders, (5th Cir. 1957) 250 F.2d 690, 693. Of paramount and continuing importance is consideration for the welfare of all children, both Negro and white.
 
 
 18
 That portion of the order of the District Court heretofore entered on May 28, 1963, denying injunctive relief is vacated; the order of the District Court entered on July 19, 1963, pursuant to our mandate in this case is continued until modified by the District Court; and the cause is remanded for the entry of appropriate orders not inconsistent herewith.
 
 
 
 Notes:
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 In their brief, the appellees state:
 "While in our opinion the proceedings on injunction pending appeal are not properly a part of the record on the appeal from Judge Lynne's decree of May 28, 1963, we decided to interpose no objection thereto. Since appellants' attorneys elected to describe the contents of the plan submitted and to complain of its sufficiency, and of Judge Lynne's actions thereon in their original brief without any supplemental record, we decided that it would be preferable that this court have before it the facts with reference to the submission of the plan, its approval, the objections made thereto and Judge Lynne's order overruling such objection, much to be preferred over the unwarranted complaints against this plan on the part of appellants, entirely dehors the record. Hence, following the rendition of Judge Lynne's memorandum opinion and order, `Additional Supplemental record,' R. 45, we filed a counter-designation, specifying the inclusion of this order in the supplemental record. This counter-designation was forwarded by the Clerk although it is omitted in the printing instituted by the appellants. We see no reason for now requesting a printing thereof, since it is on file and can still be read." p. 3-4.
 
 
 [2]
 In Calhoun, the Court stated:
 "It appears therefrom that since the argument the Atlanta Board of Education on April 8, 1964, adopted and promulgated a new formal resolution stating the present policy of the Board and the factors it will consider in making initial assignments of pupils and in permitting transfers for the school year 1964-1965." The formal resolution of April 8, 1964, to which the Court referred is as follows:
 "BE IT RESOLVED: That for the school year beginning August 24, 1964, all pupils entering the eighth grade from elementary schools be assigned among the various high schools without regard to race, after consideration of the following factors:
 "1. Choice of the pupil or his parents;
 "2. Availability of facilities; and
 "3. Proximity of the school to place of residence.
 "BE IT FURTHER RESOLVED: That among those seeking to attend a particular school, where facilities are not available for all, priority shall be based on proximity, except that for justifiable educational reasons and in hardship cases other factors not related to race may be applied. Administrative assignments or re-assignments may be made in cases of overcrowding, in hardship cases, and for disciplinary reasons. When such administrative assignments are made they shall be based on relative proximity and available facilities, giving consideration to pupil choice where possible.
 "BE IT FURTHER RESOLVED: That in those grades already reached by the Atlanta plan of desegregation (ninth, tenth, eleventh and twelfth grades), transfers be freely granted according to the criteria hereinbefore provided, without formal application, other than the usual pre-registration required of all students.
 "BE IT FURTHER RESOLVED: That where a student has exercised his choice of schools, either by initial assignment to the eighth grade or by transfer, as herein provided, further and additional transfers will be permitted only in hardship cases or for valid educational reasons unrelated to race.
 "BE IT FURTHER RESOLVED: That a certified copy of this resolution be furnished to the attorneys for transmission to the Supreme Court of the United States in accordance with its direction."
 
 
 [3]
 Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)
 
 
 [4]
 In many school systems the 10th, 11th, and 12th grades are commonly described as Senior High School; and the 7th, 8th, and 9th grades as Junior High School. In some school systems Junior High School grades and Senior High School grades are maintained and housed separately
 
 
 [5]
 220 F.Supp. 217